

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00482-CV

| | | |
|---|---|---|
| In the Interest of S.L.-E.A. | § | From the 323rd District Court |
| | § | of Tarrant County (323-95834J-11) |
| | § | March 21, 2013 |
| | § | Opinion by Justice Walker |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Sue Walker


NO. 02-12-00482-CV

IN THE INTEREST OF S.L.-E.A.

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an ultra-accelerated appeal.[2]  Father, who has engaged in a continuous course of criminal conduct from 1988 to 2009 and has seen his son S.L.-E.A. only twice during the child's life, appeals the termination of his parental rights to S.L.-E.A.  In five issues, Father challenges the trial court's paternity findings and argues that the evidence is legally and factually insufficient to

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights within 180 days after notice of appeal was filed).  We note that our opinion is required to issue on or before May 29, 2013.

support the trial court's termination findings under Texas Family Code section 161.001(1)(D), (E), (N), and (O).  We will affirm.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Because this appeal can be disposed of under the endangering conduct finding and because Father does not challenge the trial court's best interest finding, we omit testimony related to the best interest factors in the background set forth below.

### A.  Father's Criminal History

At the outset of the trial, Father admitted that he had a long criminal history and agreed that he had a continuing course of criminal conduct.  Father testified regarding numerous arrests and convictions spanning from 1988 to 2009.

In 1988, Father was convicted of robbery and was placed on community supervision for ten years; it was revoked, and he ultimately served time in prison.

In 1991, Father was arrested for DWI but pleaded guilty to reckless misconduct.

In 1999, Father was arrested for theft of property $50 to $500.  Father did not recall being arrested twenty-two days after the theft for burglary of a vehicle that occurred on December 17, 1999.  The Department of Family and Protective Services (hereinafter "the Department") admitted into evidence a judgment, showing that Father was sentenced to thirty days' confinement for burglary of a vehicle.

2

In 2000, Father was arrested for forgery of a financial instrument and was placed on two years' community supervision. He was arrested later in 2000 for driving while his license was suspended and for theft of property greater than $50 with prior convictions. Father did not recall being arrested in Humble, Texas, for theft of property $50 to $500.

In 2003, Father was arrested for theft of property $1,500 to $20,000 in Fort Worth. He was convicted and sentenced to nine months' confinement in state jail.

In 2004, Father was arrested for burglary of a building but pleaded down to criminal trespass; Father was sentenced to forty days in jail. A week after Father was released from jail, he was arrested again for burglary of a building; he pleaded guilty and was ultimately sentenced to one year in jail. In October 2004, Father was arrested for unauthorized use of a motor vehicle and was sentenced to six months' confinement in state jail.

Father did not recall being arrested for unauthorized use of a motor vehicle in Houston in May 2005. The Department admitted into evidence a judgment on his plea of guilty in which Father was sentenced to forty-five days' confinement for unauthorized use of a motor vehicle.

Father also did not recall being arrested for another unauthorized use of a motor vehicle in January 2006 and being sentenced to twenty days' confinement. In May 2006, Father was charged with assault in Austin; Father testified that he assaulted his male roommate after the roommate attacked him. Father spent

3

thirty days in jail. In October 2006, Father was arrested for criminal trespass in Round Rock; he was sentenced to 180 days' confinement. Father did not recall also being charged in October 2006 with theft of property less than $1,500 with two or more prior convictions.

In 2009, Father pleaded guilty to cultivation of a controlled substance because marijuana was growing on the property that Father was leasing; Father received two years' community supervision.[3]

### B. Father's History with Mother and S.L.-E.A.'s Birth

Father testified that he is the father of S.L.-E.A. Mother left Father when she was two months' pregnant with S.L.-E.A. Father explained that Mother "likes to fuss and fight" and described her as "kind of volatile."

Mother notified Father on Facebook in early December 2011 that S.L.-E.A. had been born on November 10, 2011.[4] Father was concerned that Mother and S.L.-E.A. had tested positive for marijuana at the time of S.L.-E.A.'s birth. Father

---

[3]Father testified that his community supervision term was set to expire in January 2013.

[4]S.L.-E.A. was born with a birth defect in his heart. He was diagnosed with severe pulmonary artery branch hypoplasia, super-valve aortic stenosis, and a small aorta. His condition requires that he be watched carefully because doctors are not sure how his growth will affect his heart; he needs to be constantly monitored to see whether his lips are turning blue and whether his extremities are cold. An angiogram that was performed on October 5, 2012, was not successful in improving his circulation.

Father believed that S.L.-E.A. could have life-threatening heart problems and requested that S.L.-E.A. be tested for Williams Syndrome because heart problems run in his family. The test was negative.

4

knew that Mother had a problem with drugs and said that she used "whatever she could get her hands on." Father said that Mother was not a "fit parent."

## C. S.L.-E.A.'s Removal from Mother

In late December 2011, Mother notified Father that she had fought with her mother, that she had moved to a shelter, and that the shelter had made a report to Child Protective Services (CPS). S.L.-E.A. was removed from Mother at the shelter because she had left him alone in the room and had allowed others at the facility to care for him.

## D. CPS's Investigation

Veronica Swink, a CPS investigator, testified that a referral came in on December 10, 2011, stating that Mother did not receive prenatal care, that Mother had used marijuana during the first six months of her pregnancy, that S.L.-E.A. had tested positive for marijuana, that Mother had mental health issues and was not taking her medication, and that Father had supplied Mother with drugs.

Swink spoke with Father, who was living in Houston, over the phone and told him that there was an open investigation, that Mother had agreed to do Family-Based Safety Services (FBSS), that there was a concern about drug use and family violence,[5] and that Father was not allowed to have unsupervised

---

[5]Father told Swink that he and Mother had gotten into "spats" and that Mother had hit him; Father denied ever physically assaulting Mother. Mother told Swink that Father had "split her head open on three occasions" and that Father

contact with S.L.-E.A. Swink told Father that when he moved to Fort Worth, he could have supervised visits with S.L.-E.A. Swink did not perform a drug test on Father, nor did she look at his residence. Father was offered FBSS and was willing to participate.

Swink's disposition of the case was "Reason To Believe for physical abuse" of S.L.-E.A. by Mother and "Reason To Believe for neglectful supervision" of S.L.-E.A. by Mother's mother. Swink did not make any findings related to Father.[6]

### E. Father's Trip to See S.L.-E.A. and Arrest on Outstanding Warrant

After Father spoke with Swink, he took the bus to Fort Worth and stayed in a homeless shelter in order to conserve his resources so that he could rent his own place. Father visited with S.L.-E.A. once during this trip to Fort Worth. But after three or four days at the homeless shelter, Father was arrested on a warrant out of Oklahoma because he was behind on his fines and court costs.

---

was physically violent because he was using cocaine, marijuana, and methamphetamine.

[6]Father testified that he had no idea why his son was in foster care because he was not there when S.L.-E.A. was removed from Mother; Father understood that there were allegations that Mother was neglecting S.L.-E.A. Because S.L.-E.A. was removed from Mother, Father did not understand why he was under so much scrutiny. Father later agreed that he was not available to take custody of S.L.-E.A. in December 2011 and that foster care was the only option at that time.

6

## F. Father's Housing, Income, and Transportation

After Father bonded out of jail, he set up a home in Oklahoma and made preparations to bring S.L.-E.A. home. He testified that at the time of the termination trial, he was renting a three-bedroom home on 120 acres in Okemah, Oklahoma, and had lived there by himself for four months. Father described the area where he lives as "nice and serene" and testified that there are no drugs or criminal activity. Father said that he has a crib, two car seats, a baby bed, a stroller, and a bounce seat for S.L.-E.A. But Father admitted that he had been moving around during S.L.-E.A.'s life and agreed that he had not demonstrated over the course of the case an ability to provide S.L.-E.A. with a safe and stable living environment.

Father testified that he receives $698 in SSI each month "for an anxiety disorder"[7] and that he makes approximately $400 per month doing odd jobs. Father pays $250 for his rent, and his bills average approximately $455 per month. Father said that he could get food stamps and Medicaid for S.L.-E.A.

Father explained that he had transportation issues: he owed $100 to get his driver's license reinstated and did not have car insurance; he planned to pay a $100 reinstatement fee for his driver's license so that he could drive his car. Father's license was suspended at the time of the termination trial and had been

---

[7]Father said that he had been diagnosed with Schizo-affective disorder. He initially took medication for his condition, but then he discontinued the medication and resolved his anxiety "through environment."

suspended since 2005, but he drove until 2009. Father testified that he could call for transportation at no cost.

## G. CPS's Testimony Regarding Father's Services

Gale Davis, the CPS conservatorship worker for S.L.-E.A., developed a service plan for Father. Father signed the service plan on March 9, 2012.[8] In April, Father requested an extension of time to complete his parenting classes until he could purchase high-speed internet. Davis responded "[j]ust complete them as soon as you can." Davis testified that the only thing that Father completed on his service plan was one of the eight modules in his online parenting class.

Davis testified that Father called her once a week at the beginning of the case, but he stopped calling in April 2012. Davis had not conducted a home study on Father's home in Oklahoma. The one drug test conducted on Father was negative for everything.[9]

## H. Father's Testimony Regarding His Compliance with His Service Plan

Father testified that his service plan was mailed to him but that he did not complete his services. Father believed that Mother was working toward getting

---

[8]Davis testified that the court had not made an order for the service plan to become an order of the court.

[9]Father testified that he had started using marijuana and cocaine in 1998 but that he had not used cocaine in two and a half or three years. Father later testified that he had not used marijuana and cocaine for one and a half to two years. Father said that he used drugs when he was depressed but that he was over that now.

custody of S.L.-E.A., and so he "kind of backed off" because he believed that "the Court usually goes towards the mother."

Father explained that he did not participate in individual counseling because he did not have transportation.

Father had not completed parenting classes because he did not have high-speed internet. Father said that high-speed internet would cost $60 per month.

Father was unable to visit with S.L.-E.A. during the year prior to the termination trial because he did not have $128 for the bus fare for the five-hour trip and would need permission to leave Oklahoma due to his community supervision.

Father had not submitted to a drug and alcohol assessment.

Father did not provide proof of financial stability, as required by his service plan, but at the time of the termination trial, he had provided an appropriate housing plan and had lined up transportation.

Father testified that he had not maintained weekly contact with his caseworker, as required by his service plan. Father went six months without having contact with CPS because

> I kind of got discouraged with it. You want to know why? I'll tell you. Because doing the service plan, in your mind, that's the number one priority, but in my mind, it wasn't, because I didn't have my own home yet, so I tried to figure out what's the first things first, so I needed to get a home, so I started striving to do that. Getting the service plan done, I wasn't doing drugs, I didn't feel like I needed an assessment done, I'm not doing any drugs, and the parenting class, I wasn't able to do it, so I just kind of discarded it and focused on getting a place to live and all that and wait on a court date and try to

9

come here and present myself as a sober individual ready to take care of his son, and that's why I'm here now.

Father said that he was willing to work his services now that he had a home, a support group, and transportation in place.

## I. Father's Parenting Skills

Father testified that he had experience in caring for young children; he had cared for his daughter for the first two years of her life from 1990 to 1992.[10]

Father visited with S.L.-E.A. for the second time in his life during the week before the termination trial. During the visit, Davis noted that Father interacted well with S.L.-E.A., that Father was appropriate in giving affection, and that Father checked S.L.-E.A.'s diaper.

Father testified that he would allow his sister's husband, who is a registered sex offender, to drive S.L.-E.A. around. Father did not believe that it would be unsafe to leave S.L.-E.A. with Father's sister's husband because he and his wife P. (Father's sister) were already raising Father's son K. Father testified that he had initiated a report to have the situation—that his son K. was living with a registered sex offender—checked out, and "it checked out okay." Father later testified that it concerned him that his brother-in-law was twenty-three or twenty-four at the time he had sexual contact with a thirteen year old.

---

[10]Father testified that in addition to S.L.-E.A., he had a daughter M., who was born in 1990; a son S., who was born in 2000 and was deceased; and a son K., who was born in 2009. None of Father's children lived with him at the time of the termination trial.

10

## J. Father's Plans

Father testified that he is a different person now than he was two years ago. Father testified that he could provide a good home for his son. Father had not engaged in criminal conduct during the year prior to the termination trial and testified that he would not use drugs and would not engage in criminal activity in the future.[11]

Father planned to get his driver's license reinstated so that he would be able to drive S.L.-E.A. to the doctor, if necessary. Until then, he had friends who were willing to drive him.

Father defined a "fit parent" as someone who gives financial support, stimulation, rules, and guidelines; who teaches the child the alphabet; who changes diapers; and who talks to the child. Father admitted that he had not provided for S.L.-E.A. financially; that he had not laid down any rules or guidelines for S.L.-E.A.; that he had not taught S.L.-E.A. the alphabet; that he had changed only one diaper; that he had not communicated with S.L.-E.A. from December 2011 until the October 24, 2012 visit; and that he had not provided correction and direction to S.L.-E.A.

---

[11]At the time of the termination trial, Father was on community supervision for his cultivation charge. Father had paid all of his community supervision fees in order to leave the State of Oklahoma to attend the termination trial in Texas. He was paying $50 per month on his court costs and fines, instead of the $25 minimum monthly payment, in order to pay them off quickly.

11

Father agreed that S.L.-E.A. deserves to be raised by someone who is stable, who is willing to follow the law, who is able to provide for him financially, and who is concerned about his physical health. Father agreed that over the prior twenty years, he had been "anything but stable." Father testified that more than half of the blame was his because he should have already been stable.

Father testified that he did not want his rights terminated; he wants to be a part of his son's life.

## K. Recommendations

Father's sister P.[12] testified that she did not believe Father's parental rights should be terminated because he has turned his life around. She admitted that he has a long history of criminal conduct and of drug use, which included use of methamphetamine and marijuana,

> but he has gotten off drugs, he's gotten himself together and made the right choices, so I think he should have a chance to have a relationship with his child, plus this child was not taken away from him. This child was taken away from [Mother] because of her choices and action.

P. believed that Father had changed because he had taken responsibility for his past actions, had obtained a job and a car, and was not using drugs. P. said that Father has her support to help raise S.L.-E.A. P. believed that Father "will do

---

[12]P. is married to a registered sex offender, and her nineteen-year-old son has been charged with a sexual offense involving a six-year-old male. P. was in the process of adopting Father's three-year-old son K., to whom Mother and Father had voluntarily relinquished their parental rights.

whatever he needs to do to provide for [S.L.-E.A.] and give that child a stable life."

P. testified that she would not, however, allow Father to raise her children but that she allowed him to have supervised contact with her children. P. explained that she did not think that Father was financially stable enough to raise her children, including his son K.

Davis, S.L.-E.A.'s conservatorship worker, asked the trial court to terminate Father's parental rights and testified that she believed that it is in S.L.-E.A.'s best interest for Father's parental rights to be terminated. Davis said that Father has not been involved in S.L.-E.A.'s life, has not demonstrated an ability to parent effectively, has a criminal history that is concerning, and has an untreated mental health issue. Davis said that there are "just too many variables that cause[] him to appear to be unstable."

Lori Archibald, the Court-Appointed Special Advocate, testified that CASA recommended termination of Father's parental rights based on his lack of contact with S.L.-E.A.

During closing, the ad litem for S.L.-E.A. recommended termination of Father's parental rights. His recommendation was based on Father's continuing course of criminal conduct, his failure to work the service plan, his failure to exercise visitation other than on two occasions, and his failure to demonstrate an ability to take care of a "medically-needy" child.

## L. Trial Court's Disposition

After noting at the outset of the trial that a "Certificate of Paternity Registry Search" was on file indicating that a diligent search of the registry had been made and no "Notice of Intent to Claim Paternity" had been located, the trial court found by clear and convincing evidence that Father did not file an admission of paternity or a counterclaim for paternity and that Father had not registered with the paternity registry. After hearing the testimony above, the trial court found by clear and convincing evidence that Father had knowingly placed or knowingly allowed S.L.-E.A. to remain in conditions or surroundings that had endangered S.L.-E.A.'s physical or emotional well-being, had engaged in conduct or knowingly placed S.L.-E.A. with persons who had engaged in conduct that had endangered S.L.-E.A.'s physical or emotional well-being, had constructively abandoned S.L.-E.A., and had failed to comply with the provisions of a court order that specifically established the actions necessary for Father to obtain the return of S.L.-E.A. The trial court thereafter signed an order terminating Father's parental rights to S.L.-E.A.

## III. BURDEN OF PROOF AND STANDARD OF REVIEW

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever

14

permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 n.1 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.*; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a) (West 2008). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may

not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re*

16

*H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Father violated section 161.001(1)(D), (E), (N), or (O).  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (O); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).   If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.

## IV. LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE SUPPORTS SECTION 161.001(1)(E) ENDANGERING CONDUCT FINDING

In his third issue, Father argues that the evidence is legally and factually insufficient to support the trial court's section 161.001(1)(E) endangering conduct finding.  Specifically, Father argues that the Department offered no evidence that Father's conduct posed any danger to his son and that he never had possession of his son to place him with anyone.

As we have explained in a similar case,

> Endangerment means to expose to loss or injury, to jeopardize. . . .
>
> . . . .
>
> . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act.  Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

17

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

*In re A.J.M.*, 375 S.W.3d 599, 605 (Tex. App.—Fort Worth 2012, pet. denied) (en banc).

Even though imprisonment standing alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a factor that we may properly consider on the issue of endangerment. *In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012); *Boyd*, 727 S.W.2d at 533–34; *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.). The Department is not required to show that incarceration was a result of a course of conduct endangering the child; it must show only that incarceration was part of such a course of conduct. *Boyd*, 727 S.W.2d at 533–34; *M.R.*, 243 S.W.3d at 819. When incarceration affects the parent's ability to care for his child, to provide safe living conditions, or to ensure the child's safety and well-being, then such incarceration can be a part of a course of continuing conduct. *See M.R.*, 243 S.W.3d at 819. Even evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child can support a finding that a parent engaged in a course of conduct that endangered the child's well-being if the Department introduces evidence concerning the offenses and establishes that

18

the offenses were part of a voluntary course of conduct that endangered the child's well-being. *E.N.C.*, 384 S.W.3d at 804–05; *A.J.M.*, 375 S.W.3d at 606.

A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02–08–00029–CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.); *see also Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). Further, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

Here, the fact that Father was not present when S.L.-E.A. was removed and never had possession of S.L.-E.A. does not preclude the trial court's finding of endangering conduct; a child's emotional well-being can be negatively affected when parents repeatedly commit criminal acts that subject them to incarceration that results in their being absent from the child's life and unable to provide support, thus creating an emotional vacuum in the child's life and subjecting the child to ongoing uncertainty regarding who will care for him. *See In re B.P.W.*, No. 02-05-00288-CV, 2006 WL 2507340, at *2 (Tex. App.—Fort Worth Aug. 31, 2006, no pet.) (mem. op.).

As set forth above, the record contains seven judgments related to various crimes committed by Father. The record also contains Father's testimony regarding his multiple arrests from 1988 to 2009, including testimony that at the time of the termination trial, Father was on community supervision for the 2009 cultivation charge. Father admitted that he had a long criminal history and agreed that he had engaged in a continuing course of criminal conduct. Father's testimony regarding his instability reveals that his criminal violations and incarcerations affected his ability to provide a stable living environment for S.L.-E.A.

Father described Mother as "kind of volatile" and "not a fit parent" and admitted that he knew that Mother used drugs. The record reveals that despite Father's knowledge of Mother's drug use, her volatility, and her unfitness as a parent, he did not attempt to rescue S.L.-E.A. from her; instead, he met S.L.-E.A. for the first time after S.L.-E.A. was removed from Mother for neglectful supervision. Moreover, when Father believed that Mother was working her services, he backed off in working his services.

This is not, as Father argues, a case like *In re E.N.C.*, 384 S.W.3d 796 (Tex. 2012). In that case, the supreme court held the evidence legally insufficient under section 161.001(1)(E) to constitute an endangering course of conduct because—unlike the scenario before us—the Department did not put on any evidence concerning the *single* offense committed by father years before his children were born, nor did the Department put on evidence regarding the

20

circumstances of the father's deportation. *Id.* at 798. The evidence in *E.N.C.*—unlike the evidence presented here—revealed that after the father was deported, he provided for his children, he kept in contact with the Department, he visited with his children through monthly phone conferences, and he testified that he never saw the children's mother use drugs. *See id.* at 798–801. *E.N.C.* is thus distinguishable on its facts.

Although Father had made positive improvements in his life by renting a home, by gathering the necessary items for a young child, and by staying off drugs and not committing any new crimes while the case was pending, evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a long history of criminal conduct and irresponsible choices. *See J.O.A.*, 283 S.W.3d at 346. Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there was some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Father had engaged in conduct or had knowingly placed S.L.-E.A. with persons who had engaged in conduct that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *J.O.A.*, 283 S.W.3d at 346 (holding evidence legally sufficient to support trial court's section 161.001(1)(E) finding because father had a long history of drug use and irresponsible choices, including an arrest for domestic violence); *In re V.V.*, 349 S.W.3d 548, 555–57 (Tex. App.—Houston [1st Dist.]

2010, pet. denied) (holding evidence legally sufficient to support trial court's section 161.001(1)(E) finding because father had extensive criminal history and made no effort to care for his daughter when he was not incarcerated); *In re M.J.M.L.*, 31 S.W.3d 347, 351–52 (Tex. App.—San Antonio 2000, pet. denied) (holding evidence legally sufficient to support trial court's section 161.001(1)(E) finding because father knew mother was a drug addict and left child in mother's care); *see also In re A.H.*, No. 02-12-00096-CV, 2012 WL 4450490, at *7–8 (Tex. App.—Fort Worth Sept. 27, 2012, no pet.) (mem. op.) (holding evidence legally sufficient to support trial court's section 161.001(1)(E) finding because mother's drug use, unstable work and housing history, decisions to leave her children with known drug users, and history of criminal violations and incarcerations affected her ability to provide a stable living environment for child).

Giving due deference to the factfinder's endangering conduct finding, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Father had engaged in conduct or had knowingly placed S.L.-E.A. with persons who had engaged in conduct that endangered his physical or emotional well-being. *See A.J.M.*, 375 S.W.3d at 607–09 (holding evidence factually sufficient to support trial court's section 161.001(1)(E) finding because father had chosen to break the law, risking and resulting in incarceration and inability to care for his daughters and that he had also left them with an inappropriate caregiver); *A.H.*, 2012 WL 4450490, at *7–8 (holding evidence

22

factually sufficient to support trial court's section 161.001(1)(E) finding because mother's drug use, unstable work and housing history, decisions to leave her children with known drug users, and history of criminal violations and incarcerations affected her ability to provide a stable living environment for child). We overrule Father's third issue.[13]

## V. CONCLUSION

Having overruled Father's third issue, which is dispositive of the appeal, we affirm the trial court's judgment terminating Father's parental rights to S.L.-E.A.

SUE WALKER
JUSTICE

PANEL:  WALKER, MCCOY, and MEIER, JJ.

DELIVERED:  March 21, 2013

---

[13]Because only one ground under section 161.001(1) is needed to support termination, we need not reach Father's second, fourth, and fifth issues pertaining to the trial court's findings under subsections (D), (N), and (O). *See* Tex. R. App. P. 47.1 (stating that appellate court need only address every issue necessary to final disposition of appeal).  And because the trial court terminated Father's parental rights to S.L.-E.A., despite Father's failure to file an admission of paternity or to register with the paternity registry, we need not address Father's first issue challenging the paternity findings in the termination order. *See id.*